WILLIAM B. CRANE and PHYLLIS C. CRANE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Crane v. Commissioner
Docket No. 554-76.
United States Tax Court
T.C. Memo 1979-276; 1979 Tax Ct. Memo LEXIS 247; 38 T.C.M. (CCH) 1077; T.C.M. (RIA) 79276; July 24, 1979, Filed Charles B. Bailey, Jr., Brock B. Gordon, E. Watson Smith, and Andrew L. Smith, for the petitioners. Robert W. West, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for the years 1967, 1968, 1969, 1970 and 1971 in the respective amounts of $1,055, $5,482.55, $10,535, $3,748.47 and $6,038.72. The issues for decision are: (1) Whether petitioners are entitled under section 165 (c) (3), I.R.C. 1954, [1] to claimed theft losses in 1970 because of unrepaid advances to Atlantic General Fiberglass Products, Inc. and Associated Industries, Inc. and, if so, the amount of the loss with respect to the advances to Atlantic General Fiberglass Products, Inc.; and *249 (2) whether the second examination of petitioners' books and recordsconformed with the provisions of section 7605(b) and respondent's established procedural guidelines. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. At the time of the filing of their petition herein William B. Crane and Phyllis C. Crane, husband and wife, resided in Mobile, Alabama. They filed joint Federal income tax returns for the calendar years 1967 through 1971 with the Internal Revenue Service Center in Chamblee, Georgia. During each of the years in issue William B. Crane (petitioner) was employed as an investment banker by Thornton, Farish and Gauntt, Inc. He dealt primarily with municipal bonds, assisting municipalities in raising money. Petitioner had previously been employed in the trust department of the American National Bank of Mobile, where on occasion he forwarded loan applications to the bank's loan committee. Petitioner, in connection with his business, was familiar with financial statements. During 1967 and 1968, petitioner also served as financial advisor to the city of Bayou La Batre, Alabama. In that capacity, petitioner attended a meeting *250 at which Mr. Robert P. Lacy proposed that the city issue industrial development bonds to finance the construction of a boat manufacturing plant for Atlantic General Fiberglass Products, Inc. (Atlantic General). Mr. Lacy had organized Atlantic General prior to 1968 and was its president and managing officer. Although petitioner believed Mr. Lacy's proposal to be a good one, he recommended its rejection by the city because of the city's financial condition. The city subsequently rejected the proposal. Approximately a week after this meeting Mr. Lacy contacted petitioner to solicit petitioner's assistance in arranging private financing for the proposed boat plant. Mr. Lacy presented projections showing a sizable profit margin in the manufacture and sale of fiberglass boats. He pointed out that the Mobile area was ideal for the manufacture and sale of boats, as the nearest boat plants were in Jacksonville, Florida and Houston, Texas. Mr. Lacy claimed to be well qualified, stating that he had had extensive experience in the manufacture and sale of boats.He showed petitioner a demonstrator model, a 23-24 foot inboard-outboard, which he invited petitioner to use for a weekend. Petitioner *251 became convinced that some of his customers might have an interest in Mr. Lacy's proposal and later introduced several of his customers to Mr. Lacy. Petitioner told his customers that the proposed venture was speculative, but that they might make a substantial profit. Later, at least two of the investors introduced to Mr. Lacy by petitioner, along with eight others, were persuaded by Mr. Lacy to put up the sum of $100,000 in cash and to sign guaranty agreements for an additional $100,000 so that the business could get off the ground. Petitioner did not invest in Atlantic General initially. Mr. Lacy rewarded petitioner for his help, however, by giving petitioner 5,000 shares of stock in Atlantic General that he (Mr. Lacy) had previously owned. A public stock offering was planned by Atlantic General during 1968, and a draft prospectus was filed with the Alabama Securities Commissioner. Mr. Lacy requested that petitioner serve on the board of directors of Atlantic General, and petitioner initially agreed to be a director. After consulting with his employer, however, petitioner decided against serving as a director and so informed Mr. Lacy within two or three days after having *252 stated that he would serve on the board. The draft prospectus filed with the Alabama Securities Commissioner had listed petitioner as a director, but after having decided not to serve on the board, petitioner requested Mr. Lacy to remove his mame as a director. Atlantic General soon began to suffer from a cash shortage. On April 19, 1968, petitioner advanced Atlantic General $2,500. He had borrowed this sum from The Merchants National Bank. Atlantic General used these funds to pay the legal fees of an attorney employed in connection with the public sale of stock of the corporation. By July 1, 1968, Atlantic General owed $15,000 in past due Federal employment taxes, which the corporation could not afford to pay. Mr. Lacy requested petitioner to advance the corporation $15,000 to satisfy this obligation. Petitioner borrowed this amount from The Merchants National Bank and advanced it to Atlantic General. To secure this advance, Mr. Lacy caused three bills of sale covering three boats to be given to petitioner. Petitioner was informed that sales orders had already been received. These bills of sale were to be held as security for petitioner's advance.Mr. Lacy told petitioner *253 that he would be repaid from the sales proceeds of these three boats. Atlantic General gave petitioner a note for $15,000, which petitioner discounted at a bank. Mr. Lacy promised petitioer that he would pay the bank. Petitioner was subsequently notified by the bank that the note was past due. An office worker told petitioner that one of the boats had been sold. Petitioner checked on the other two boats and found that they had likewise been sold. Mr. Lacy told petitioner that he had used the sales proceeds to buy materials and pay his payroll. Petitioner never received repayment of this $15,000 advance and never took any action to collect the debt from Atlantic General. Mr. Lacy asked petitioner to "stick with him" and told petitioner if he did he would be repaid. On May 1, 1969, petitioner advanced Atlantic General $13,818, which he had borrowed from The First National Bank. The corporation used this money to pay past due Federal employment taxes of approximately $8,400 and a bank overdraft. On May 30, 1969, petitioner endorsed Atlantic General's note in the amount of $6,099 payable to the city of Mobile for past due rent for property leased from the city. This was necessary *254 to enable Atlantic General to escape the lease and move to new quarters. When Atlantic General failed to pay the note, the city demanded payment from petitoner, and petitioner paid the note. On June 3 and June 4, 1969, petitioner made further advances to Atlantic General in the respective amounts of $500 and $250. On June 30, 1969, petitioner advanced $7,000 to Atlantic General, so that the company would have operating capital. Mr. Lacy told petitioner that the company had a postdated check for $5,000 in payment of Atlantic General stock purchased by a lady in Andalusia, Alabama. He asked petitioner to borrow against the check and to put up an additional $2,000. Petitioner took the check to a bank and borrowed $5,000 on it and provided an additional $2,000 from his own funds. When petitioner subsequently presented the check for payment, it was returned marked "insufficient funds." Mr. Lacy instructed petitioner to re-deposit the check. Petitioner did so, but the check was again returned marked "insufficient funds." Mr. Lacy told petitioner that the lady had changed her mind with respect to a purchase of Atlantic General stock. Atlantic General did not have sufficient cash *255 to repay petitioner, and Mr. Lacy told petitioner that he would repay him whenever he was able. On September 19, 1969, so that Atlantic General could have additional operating capital to continue operations, petitioner and two associates, Mr. William Taylor and Mr. Richard Conboy, agreed to advance $150,000 to the corporation. Mr. Lacy agreed tht Atlantic General would give petitioner a note for $150,000, 75,000 shares of its stock and a voting trust agreement giving petitioner, Mr. Taylor and Mr. Conboy control of the corporation. Mr. Lacy presented petitioner and his associates with a statement of Atlantic General's financial condition as of December 31, 1968. At a meeting in the office of his accountant Mr. Lacy presented a projection of potential operating revenues and costs to petitioner and Mr. Conboy. At a subsequent meeting in Mr. Taylor's office, petitioner, Mr. Taylory and Mr. Conboy decided to make the loan to Mr. Lacy. At one of these meetings Mr. Lacy explained the financial statement to petitioner and his associates. This statement reflected current liabilities exceeded current assets, but that the company was solvent.When he decided to lend the $150,000 to Atlantic *256 General, petitioner knew the corporation's financial position was "shaky." Mr. Conboy paid $50,000 to the corporation as his share of the loan. Petitioner borrowed the remaining $100,000 from The Merchants National Bank and paid this amount to Atlantic General. Mr. Taylor guaranteed $50,000 of the amount borrowed by petitioner from The Merchants National Bank. A promissory note for $150,000 payable to petitioner was issued by Atlantic General, and the 75,000 shares in Atlantic General were issued in petitioner's name. The stock was intended to be and was in fact held for the benefit of all three lenders.Mr. Lacy's attorney drafted a voting trust agreement which, in combination with the 75,000 shares of stock, would have given petitioner and his associates voting control of the corporation, but the trust instrument was never executed. Mr. Lacy later told petitioner that he had sold the shares of Atlantic General stock which were to have gone into the voting trust. The $150,000 was deposited in an account for Atlantic General, for which petitioner had signatory power. Petitioner wrote all the checks that were written on this account, and the checks were substantiated by vouchers *257 provided by Mr. Lacy. Petitioner made additional advances to Atlantic General on the following dates in the amounts indicated: December 3, 1969
$3,136.64
December 12, 1969
1,500.00
December 15, 1969
1,853.80
December 17, 1969
872.50
February 26, 1970
4,100.00
In addition, petitioner made various other miscellaneous advances to Atlantic General. An accountant subsequently engaged by petitioner who prepared petitioner's 1970 Federal income tax return, advised petitioner to claim a theft loss under section 165(c) (3) for his advances to Atlantic General. In connection with determining to give petitioner this advice, this accountant examined the balance sheet of Atlantic General for the period ended December 31, 1968, which petitioner had been furnished by Mr. Lacy and had examined before deciding to loan Atlantic General the $150,000. The accountant, Mr. Andrew Wiik, was of the opinion that the item of "Cost of Acquiring Capital" and a part of theitem of "Organization and Relocation Costs" shown as assets on the balance sheet had no value and should not have been carried as assets on the balance sheet. [2] Mr. Wiik was of the opinion that the shareholders' *258 equity on the balance sheet for the period ended December 31, 1968, was a negative $84,964. Mr. Willk also examined balance sheets for the periods ended January 31, 1968 and June 20, 1968, and stated his opinion that *259 these balance sheets were incorrect in their treatment of deferred charges and of an account receivable due from Mr. Lacy. In Mr. Wiik's opinion the account receivable due from Mr. Lacy should be written off as an asset against an allowance for bad debts since Mr. Lacy was not financially able to pay the account. Mr. Wiik was of the opinion that the deferred charges shown on the financial statements were incorrect.In his opinion relocation costs should have been charged off as an expense, not capitalized. Promotional, financial and consulting services in connection with the offering of stock should not, in Mr. Wiik's opinion, have been capitalized. Rather, depending on the nature and origin of the expenses, such expenses should either be charged off as expenses or else not reflected on the financial statements at all. Mr. Wiik was of the opinion that the proper amounts of the shareholders' equity on the balance sheets for the periods ended January 31, 1968 and June 20, 1968 were negative $49,196 and $57,716, respectively. Although petitioner examined the balance sheet for the period ended December 31, 1968, in deciding to advance the $150,000 to Atlantic General, he could not *260 recall having ever seen the balance sheets for the periods ended January 31, 1968 and June 30, 1968. In determining that petitioner's advances to Atlantic General had been induced by fraud, and therefore constituted theft losses Mr. Wiik relied not only on the balance sheets, which he deemed improper, but statements made to him by former accountants of Atlantic General with whom he had talked. One of these former accountants had told Mr. Wiik that he suspected that Atlantic General's funds had been diverted to satisfy Mr. Lacy's personal obligations and that Mr. Lacy had requested him to revalue upward the boat molds sold by Mr. Lacy to Atlantic General in order to wipe out Mr. Lacy's debt to the corporation. Mr. John Dees was one of the accountants employed by Atlantic General. He prepared the balance sheets for the periods ended January 31, 1968 and June 20, 1968. Mr. Dees and his associates were dissatisfied with Mr. Lacy's inventory control. To test a new method of inventory control, Mr. Dees had an Atlantic General plant employee tag three boats with numbers. A week later, checking sales invoices against the number of boats sold, he could not locate one of the boats. *261 Mr. Lacy told him the boat was on consignment in Florida and had not been sold. Mr. Dees had no direct knowledge of fraud or theft at Atlantic General, but he and his associates had attempted to run the inventory check and other checks because of their suspicions. In 1969, when requested by Atlantic General to make an audit, Mr. Dees put a bookkeeper in the Atlantic General offices under his supervision to attempt to assemble adequate records to conduct an audit, but Mr. Dees withdrew from the assignment because adequate records could not be assembled. Mr. Lacy never asked Mr. Dees to falsify or alter the books of Atlantic General or to prepare a false statement. On March 19, 1970, Atlantic General filed a voluntary petition in bankruptcy seeking a rearrangement of its affairs under Chapter 11 of the Bankruptcy Act. Accompanying the petition was a statement of income for the period beginning November 1, 1968 and ending February 28, 1970. This statement reflects a beginning inventory of $184,546.65, an ending inventory of $10,675, and boat sales of $153,769.59. On May 28, 1970, petitioner filed a proof of claim in bankruptcy claiming that Atlantic General owed him $209,115.49 *262 for money loaned to the corporation. The referee in bankruptcy reduced petitioner's claim to $207,741.56.[3] The referee allowed petitioner's claim, but, because of petitioner's knowledge of Atlantic General's precarious financial condition, the referee subordinated petitioner's claim to the claims of the general unsecured creditors. Petitioner never took any civil action against Mr. Lacy to recover his advances to Atlantic General, nor did he seek to have Mr. Lacy prosecuted for obtaining money from him by fraud or false pretenses. [4]
On or about October 18, 1968, petitioner was introduced to Mr. Mathis, who wanted to discuss the prospects for a public stock offering for Mr. Mathis's corporation, Associated Industries of Mobile (Associated). Petitioner *263 referred Mr. Mathis's proposal to his employer, but his employer did not want to participate in obtaining the necessary funds. Mr. Mathis subsequently informed petitioner that he had arranged for a small New York investment firm to handle Associated's public stock offering. He asked petitioner to borrow for use of Associated $24,000 from the Deposit National Bank, in which Mr. Mathis and several of his corporations held a controlling interest. These funds were to be used to pay the expenses of starting the corporation, including the expenses of the public stock offering.Petitioner was to receive repayment of his loan and shares of common stock in Associated. Mr. Mathis represented to petitioner that he would repay petitioner's 90-day note to the bank within 30 to 60 days. Petitioner borrowed the $24,000 and advanced it to Associated. Subsequently, however, Associated's major creditor foreclosed upon its loans to Associated. Although the public stock offering did not materialize, an offering was planned. An attorney for Mr. Mathis arranged with a New York firm for a prospectus to be prepared. A prospectus was in fact prepared and filed with the Securities and Exchange Commission. *264 Mr. Mathis gave petitioner a copy of the prospectus. A written agreement between Associated and the underwriter was signed, and final arrangements were made for the underwriting, but the underwriting fell through when Associated lost its financial support from its bank and had to withdraw its prospectus. Shortly thereafter Mr. Mathis was indicted and convicted in the Circuit Court of Mobile County, Alabama on two counts of obtaining money from the Mobile County School Board by false pretenses. Petitioner was required to renew his note at the Deposit National Bank. Mr. Mathis repaid $13,000 of the $24,000 loan to petitioner. During 1970 it became apparent that petitioner would not recover the remaining $11,000 owed to him on the loan. Petitioner never took any civil action against Mr. Mathis, nor sought to have him prosecuted for obtaining money by fraud or false pretenses. In preparing petitioner's Federal income tax return for 1970, Mr. Wiik determined that petitioner had incurred a theft loss of $182,435 by reason of his advances to Atlantic General as a result of false and misleading representations of Mr. Lacy and a separate loss of $11,000 by reason of his advance to Mr. *265 Mathis as a result of Mr. Mathis's fraudulent acts. The total of these two amounts, $193,435, was deducted by petitioner on his 1970 Federal income tax return as a theft loss. As a result petitioner showed a net loss of $172,764 on his 1970 return. On February 16, 1971, petitioner filed an application for tentative carryback of his 1970 net operating loss to calendar years 1967, 1968 and 1969. The carryback of these losses resulted in a zero total tax liability for all three preceding years.In addition, petitioner carried forward a part of the loss to 1971 and claimed a sufficient loss carryover in that year to result in a total tax liability of zero. Petitioner's Federal income tax returns for 1967, 1968, 1969 and 1970 were examined by a revenue agent on or before December 22, 1971. The results of this examination were reviewed and approved by an Internal Revenue Service reviewer and by the acting group supervisor. By letter dated December 22, 1971, petitioner was informed by the District Director of Internal Revenue, Birmingham, Alabama that a "no change" report had been issued for these tax returns as a result of such examination. On November 16, 1973, a re-opening memorandum *266 alleging a substantial error and a serious administrative omission on the part of the Internal Revenue Service was signed by the Birmingham District Director. By letter of the same date, the Birmingham District Director requested that petitioner make available for a re-examination his records for calendar year 1970.
On or after November 16, 1973, a revenue agent commenced the second examination of petitioner's returns. Petitioner was sent a statutory notice of deficiency for the calendar years 1967, 1968, 1969, 1970 and 1971 on November 21, 1975. In his notice of deficiency respondent disallowed the deduction of $193,435, claimed in the tax year 1970 as a casualty loss from advances to Atlantic General and Mr. Mathis. In this notice respondent determined that it had not been established that the purported loss resulted from a casualty within the meaning of section 165. Respondent further determined that petitioner did not sustain a net operating loss in the year 1970 within the meaning of section 172, as the loss was attributable solely to capital losses, which are limited in amount. Accordingly, he determined that there was no net operating loss carryback to 1967, 1968 and *267 1969 and no net operating loss carryover to 1971. OPINION Section 165(c)(3) allows as a deduction losses from theft. The word "theft" is broadly defined to include any criminal appropriation of another's property. Edwards v. Bromberg, 232 F.2d 107, 110 (5th Cir. 1956). To establish a section 165(c)(3) theft loss a taxpayer must demonstrate that his loss resulted from a transaction which, under the law of the state in which the transaction transpired, constitutes a theft. Monteleone v. Commissioner, 34 T.C. 688, 692 (1960). Petitioner contends that Mr. Lacy engaged in a scheme of false pretenses and misrepresentation of fact to induce petitioner to make advances to Atlantic General. This scheme, petitioner alleges, constituted the crime of theft under Alabama law.Petitioner focuses on three specific advances that he contends were violations of distinct criminal statutes and constituted integral parts of Mr. Lacy's overall scheme to defraud him. Petitioner claims to have learned in retrospect that Mr. Lacy's handling of corporate funds was questionable. *268 He cites statements to Mr. Wiik by two men who preceded Mr. Dees as accountants for Atlantic General. The Court admitted this testimony, not to substantively prove any illicit financial dealings of Mr. Lacy, but rather to determine the basis for Mr. Wiik's advice to petitioner to claim a theft loss on his tax return. The statements of these two accountants to Mr. Wiik are clearly hearsay and are not competent to prove that Mr. Lacy's business dealings were dishonest or unethical. There were proper objections to this testimony at trial. Petitioner also alleges that Mr. Dees's testimony indicates that Mr. Lacy was engaging in illegal business practices. Mr. Dees was dissatisfied with Mr. Lacy's methods of inventory control, and was so dissatisfied with Mr. Lacy's bookkeeping practices that he subsequently disassociated himself from Atlantic General. Nothing in Mr. Dees's testimony points to any specific instances of illegality, or to any incident of deception or trickery involving petitioner.
Petitioner argues that the $15,000 advance to Atlantic General in July of 1968 was obtained by fraud and deceit in contravention of *269 section 13-4-2, Code of Alabama 1975, which provides as follows: Sec. 13-4-2. Removing, selling or buying personal property to which others have claim. Any person who removes or sells any personal property for the purpose of hindering, delaying or defrauding any person who has claim thereto under any written instrument, lien created by law for rent or advances or any other lawful or valid claim, verbal or written, with a knowledge of the existence thereof; or who, with like intent, buys, receives or conceals any such property with knowledge of the existence of any such claim, shall, on conviction, be punished as if he had stolen the same. In agreeing to make this advance petitioner relied on Mr. Lacy's representations that three boats from Atlantic General's production plant would soon be delivered and paid for. Petitioner agreed to advance the funds, receiving in exchange a promissory note for $15,000 and a security interest in the three boats. Mr. Lacy sold the boats and did not remit the proceeds either to petitioner or to the bank from which petitioner had borrowed the $15,000. Petitioner contends that Mr. Lacy's sale of the boats and failure to remit the proceeds constitute *270 a violation of section 13-4-2, Code of Alabama 1975.Petitioner relies on Kirkland v. State, 340 So.2d 1139 (Ala. Crim. App. 1976), wherein the defendant, a used car dealer, obtained a bank loan evidenced by a promissory note. He subsequently renewed the note, but at the time of renewal he had sold the car at an auction. The security agreement specifically denied the debtor the right to sell the car in any manner not authorized by the security agreement. Kirkland was convicted under the statutory predecessor of section 13-4-2, Code of Alabama 1975, of hindering, defrauding or delaying a lien holder. The appeals court affirmed the conviction, noting that one of the elements of the offense was the lack of the mortgagee's prior consent. In the instant case, by contrast, petitioner was aware that sales orders had already been taken for the boats. Moreover, petitioner testified that his agreement with Mr. Lacy called for the sale of the boats. Consequently, in our view petitioner has not demonstrated that Mr. Lacy sold the boats for the purpose of defrauding, delaying or hindering petitioner. Moreover, petitioner's failure to take any action against Mr. Lacy and continued *271 advances to Atlantic General for over a year and a half following Mr. Lacy's failure to remit the boat sales proceeds belie any assertion by petitioner that he believed Mr. Lacy had absconded with his funds, and, in our view, evidence a willingness on petitioner's part to treat the unremitted boat sales proceeds as a loan. Petitioner also relies on Kent v. State, 34 Ala. App. 443, 41 So.2d 194 (1949), and Pate v. State, 29 Ala. App. 78, 191 So. 640 (1939), for the proposition that removal of secured property raises a conclusive presumption of intent to defraud, hinder, or delay. Neither case states that the presumption is conclusive. Moreover, unlike the instant case, in neither of those cases was the sale of the security sanctioned by the security agreement. Here, by contrast, petitioner knew the boats had been sold from the outset. Petitioner also contends that Mr. Lacy's sale of the three boats violated section 13-4-1, Code of Alabama 1975, [5] which proscribes the sale of secured property without the prior consent of the secured party. Citing *272 Boyett v. State, 42 Ala. App. 220, 159 So.2d 628 (1964), petitioner argues that his consent to Mr. Lacy's sale of the boats was not effective because it was obtained by fraud. The alleged fraud is Mr. Lacy's assurances that he would repay petitioner upon the sale of the boats when, petitioner argues, Mr. Lacy never had such an intention. Petitioner would have us infer that Mr. Lacy did not intend to repay the loan at the time the loan was made from subsequent events. In our view, the inference that Mr. Lacy realistically believed he would be able to repay petitioner after Atlantic General had been in operation for some time is equally as plausible. This loan to Atlantic General was made within a short period following Atlantic General's commencement of production. Petitioner would have us infer from the subsequent turn of events that Mr. Lacy intended to deprive him of his money from the very outset. To prove that his consent to the sale of the boats was induced by fraud, petitioner would have to demonstrate that Mr. Lacy intended to retain the boat sales proceeds at the time he agreed to remit them to petitioner. Mr. Lacy's intent cannot be inferred from subsequent *273 events. Cf. Prentice v. State, 24 Ala. App. 587, 139 So. 437 (1932). Petitioner has presented no evidence tending to demonstrate that at the time petitioner loaned him the $15,000, Mr. Lacy had no intent to repay petitioner. Accordingly, in our view, petitioner has failed to sustain his burden of proving that the $15,000 loan to Mr. Lacy on July 1, 1968, contravened either section 13-4-2 or section 13-4-1, Code of Alabama 1975. *274 Petitioner next atgues that Mr. Lacy violated section 13-3-90, Code of Alabama 1975, when in June of 1969 he asked petitioner for a $7,000 loan and gave petitioner a check in the amount of $5,000 drawn on a bank in Andalusia, Alabama by a lady who was going to buy Atlantic General stock. When the $5,000 check was presented for deposit, it was twice returned marked "insufficient funds." Mr. Lacy explained to petitioner that the drawer of the check had changed her mind with respect to the purchase of Atlantic General stock. Section 13-3-90, Code of Alabama 1975, provides as follows: Sec. 13-3-90. Personal property or money. Any person who, by false pretense or token and with the intent to injure or defraud, obtains from another any money or other personal property shall, on conviction, be punished as if he had stolen it. As outlined in Spivey v. State, 55 Ala. App. 687, 318 So.2d 382, 383 (1975), there are five elements to this offense: (1) the pretense; (2) its falsity; *275 (3) acquisition of property by reason of the pretense; (4) knowledge of the falsity of the pretense by the party obtaining the property; and (5) intent to defraud. Petitioner takes the position that the pretense consisted of passing on to petitioner a purportedly valid check. The falsity, petitioner contends, consisted of Mr. Lacy's representation that the check was valid together with his assertion that a sale of Atlantic General stock had been consummated with a woman in Andalusia, Alabama. Mr. Lacy's knowledge that the check was bad satisfies the element of knowledge, according to petitioner. Petitioner concludes that his $7,000 was advanced in reliance upon Mr. Lacy's representations as to the validity of the $5,000 check and that this fact constitutes the third element of the offense. Finally, petitioner argues that Mr. Lacy's intent to defrud can be inferred from the facts and circumstances. It is true in Alabama that one who passes a bad check may be guilty of theft by false pretenses. See, e.g., Eaton v. State, 16 Ala. App. 405, 78 So. 321 (1918), upholding *276 the false pretenses conviction of a defendant who purchased groceries using a worthless check. The crucial distinction between the instant case and the Eaton case, however, is that in the Eaton case the defendant passed his own bad check. He knew or had reason to know that he had insufficient funds to cover the check. In the instant case, by contrast, there is no evidence whatever that Mr. Lacy was aware that the $5,000 check would bounce or that he knew the sale would not be completed. Petitioner would have us conclude that Mr. Lacy's representations were false in light of "some of the circumstances and some of Mr. Lacy's more flagrant deeds and actions." To bolster his argument that Mr. Lacy falsely represented the validity of the check as well as the fact of the consummated stock sale, petitioner cites a list of other instances of alleged misconduct. In short, petitioner paints Mr. Lacy as a villain and would have us assume that because villains lie, Mr. Lacy must have done so with regard to the $5,000 check. As evidence of Mr. Lacy's bad character, petitioner points out alleged incidents of misconduct as related to Mr. Wiik by two former accountants of Atlantic General. *277 We again emphasize that this testimony was admitted only to determine the basis for Mr. Wiik's advice to petitioner that he had suffered a theft loss, not as substantive evidence regarding the alleged instances of misconduct. Petitioner claims that Mr. Lacy was responsible for fraudulent and misleading financial statements and sold boats in which petitioner had a security interest without remitting the sales proceeds to petitioner. "By word, deed and action," petitioner's argument continues, "Mr. Lacy showed that he had one intent and one only, in dealing with Petitioner -- to get Petitioner's money by trickery, deceit and other means of guile." We are unwilling to find that Mr. Lacy employed false pretenses to obtain the $7,000 in June of 1969 solely on generalized allegations of misconduct by Mr. Lacy. Petitioner has failed to present evidence to sustain his position that Mr. Lacy obtained the $7,000 by false pretenses.
Petitioner next argues that Mr. Lacy in September of 1969 deceptively induced petitioner to put $150,000 into Atlantic General with full knowledge of the corporation's imminent demise in violation of both section 13-3-90, Code of Alabama 1975, and section 13-3-95, Code *278 of Alabama 1975, [6] rendering it a criminal offense for a person to obtain money by falsely representing the financial condition of a corporation.
Petitioner met with Mr. Lacy and received income projections. Thereafter petitioner met with his associates. They reviewed Atlantic General's *279 potential, determined that $150,000 was adequate working capital, and decided to make the loan. Petitioner testified that he realized Atlantic General's financial condition at this time was "shaky." Petitioner contends that in deciding to make the loan, he relied upon a balance sheet that was false and misleading in that it indicated Atlantic General was solvent. Although petitioner adduced substantial evidence at trial with regard to alleged inaccuracies in the balance sheets for the periods ended January 31, 1968 and June 20, 1968, petitioner did not rely on the accuracy of these balance sheets in making his decision to advance Atlantic General the $150,000. In fact, at trial petitioner testified that he did not recognize these balance sheets and could not recall having ever seen them. Accordingly, we deem irrelevant petitioner's assertions that the balance sheets for these periods were inaccurate in their reflection of accounts receivable from principal shareholders. Petitioner did rely on the balance sheet for the period ended December 31, 1968. Petitioner's accountant, Mr. Wiik, subsequently formed the opinion that this balance sheet was fraudulent because it reflected *280 the cost of acquiring capital as a deferred charge. In Mr. Wiik's opinion, the cost of acquiring capital either should not have been reflected on the balance sheet at all (if a brokerage commission) or should have been written off as an expense in the year incurred. The result of the inclusion of the cost of acquiring capital on the balance sheet was, in Mr. Wiik's opinion, an increase in the company's net worth in a false and fraudulent manner. Had the balance sheet been prepared in accordance with generally accepted principles of accounting, petitioner argues, it would not have reflected that the company was solvent but rather would have shown that the company was hopelessly insolvent, and petitioner would not have made the loan. Mr. Dees, formerly an accountant for Atlantic General, disagreed with Mr. Wiik on the proper treatment of the deferred charges.Mr. Dees testified that Mr. Wiik's proposed treatment of deferred charges would distort the financial picture of the corporation and that deferred charges are properly charged against paid-in surplus, reducing the funds derived from the sale of the stock. If there is no paid-in surplus, it was Mr. Dees's opinion that the promotional, *281 financial and consulting costs associated with the costs of acquiring capital should be carried in a deferred category until the stock is sold, at which time the costs of acquiring capital should be matched against the funds derived from the stock sale. If there were no paid-in surplus and no future sales of stock contemplated, Mr. Dees testified that the costs of acquiring capital should be reflected as an extraordinary loss. On cross-examination, when shown the balance sheet for the period ended December 31, 1968, Mr. Dees testified that there had been no adjustment to reflect the costs of acquiring capital. As the stock issue had been abandoned these costs should have reduced paid-in surplus to the extent thereof, with the balance reflected as an extraordinary loss. According to Mr. Dees, the effect of the mistreatment of these items was to overstate the net worth of the corporation by some $35,000 and had these items been properly treated, the balance sheet would have reflected a deficit of some $32,000. Petitioner and his associates relied upon this balance sheet in their decision to lend the corporation $150,000. Petitioner testified that had the statement not indicated *282 that Atlantic General was solvent, he would not have decided to make the advance. This testimony is speculative. Petitioner was experienced in financial matters. He examined the entire December 31, 1968 balance sheet. Certainly he understood the nature of items such as costs of acquiring capital and relocation costs regardless of where they were shown on the balance sheet. There is simply no proof that the balance sheet for the period ended December 31, 1968, was prepared with the intent to mislead or defraud petitioner. Mr. Dees did not prepare the balance sheet. The balance sheet, however, conformed with the balance sheet prepared by Mr. Dees for the period ended January 31, 1968. Mr. Lacy presented the balance sheet to petitioner in Mr. Dees's office and in Mr. Dees's presence. Mr. Dees did not examine in detail the balance sheet or notice any error therein.The proper treatment of deferred charges is a matter upon which reasonable accountants can disagree, and we are unwilling to impute to Mr. Lacy the knowledge that the balance sheet was incorrect. Such knowledge, in our view, is a necessary element of the crimes proscribed by sections 13-3-90 and 13-3-95, Code of Alabama *283 1975. [7]
Petitioner further argues that the loan of $150,000 was made pursuant to Mr. Lacy's allegedly false statement that he had 200,000 shares of Atlantic General stock which were to be put in a voting trust in favor of petitioner. On the basis of petitioner's interpretation of Mr. Lacy's statement to him, petitioner would have us believe that Mr. Lacy never owned these shares. Although the voting trust agreement was never executed, efforts were made to carry it out; a draft was prepared. Within six months following the loan of $150,000, a bankruptcy petition was filed. Petitioner testified that Mr. Lacy told him he sold the stock during this period. As the corporation was failing, it is not at all implausible that Mr. *284 Lacy sold his stock to raise funds for the sinking boat business. At any rate, there simply is not sufficient evidence in this record to show that Mr. Lacy falsely represented his holdings in Atlantic General to induce petitioner and his associates to lend the corporation the $150,000. We also note, with regard to the $150,000 loan, that the proceeds did not go directly into Mr. Lacy's pocket. The funds were put in an account over which petitioner had signatory power. Petitioner signed all checks written on the account and required justifying vouchers. Petitioner does not claim that any of the vouchers were fraudulent. Finally, petitioner argues that in addition to these three specific advances, other advances by petitioner were made because of false and misleading statements of Mr. Lacy. Petitioner points to no specific statements but rather points our allegedly illegal business practices of Mr. Lacy and argues that because of these purported illegalities, Mr. Lacy must have been harboring the intent to defruad him. The short answer to this is that generalized allegations of *285 wrongdoing on the part of a borrower simply cannot support a finding that the borrower has perpetrated a theft within the meaning of section 165 (c) (3). Lastly, we note that petitioner was somewhat knowledgeable in the world of finance. He was familiar with balance sheets and financial statements. He served as a financial advisor to a city. He was not, in our view, an unsophisticated businessman who would be overly susceptible to Mr. Lacy's overtures. Petitioner continued to make advances to Atlantic General for a period of almost two years, notwithstanding Mr. Lacy's failure to repay earlier advances as promised. Clearly, petitioner believed that Atlantic General might well have become a prospering business. Based on all the facts and circumstances, we find that petitioner has failed to establish that he incurred a theft loss under section 165 (c) (3) in his dealings with Mr. Lacy. With respect to the $24,000 loan to Mr. Mathis, petitioner argues that implicit in Mr. Mathis's assurance to petitioner that he would be repaid within 90 days was an assurance that Associated was in sound financial condition, when, in fact, Associated was in deep financial trouble. The failure *286 of Mr. Mathis to reveal this material fact to him, petitioner argues, constituted the crimes proscribed by sections 13-3-90 and 13-3-95, Code of Alabama 1975, of obtaining money by false pretenses or by false representations of a corporation's pecuniary condition. Mr. Mathis testified that he had no reason to believe Associated's loans would be foreclosed; he believed the company was current with its payments. Consequently, the evidence indicates that Mr. Mathis did not knowingly omit to tell petitioner any crucial facts with respect to Associated's financial status. A false pretense may take the form of an implied misrepresentation of a past or existing fact, Tate v. State, 335 So. 2d 212 (Ala. Crim. App. 1976). In our view, Mr. Mathis did not even impliedly represent to petitioner that Associated was in good financial condition or even that it was solvent. On brief petitioner has presented no argument with respect to the impropriety of the second examination of petitioner's records. The stipulated facts, however, indicate that the re-examination of petitioner's *287 records conformed with the provisions of section 7605 (b) and with Rev. Proc. 74-5, 1974-1 C.B. 416. Decision will be enteredfor the respondent. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue.↩
2. A summary of the December 31, 1968 balance sheet is as follows: ↩
ASSETS
Total Current Assets
$ 90,882.06
Total Fixed Assets
132,044.56
Other Assets and Deferred Charges
Bond Certificate
$15,000.00
Utility Deposit
777.00
Cost of Acquiring Capital
86,699.74
Organization and Relocation
Costs
3,112.87
$105,589.61
TOTAL ASSETS
328,516.23
LIABILITIES
Current Liabilities
Trade Accounts Payable
$ 50,272.61
Accrued Interest
11,931.07
Accrued Payroll Taxes
13,917.02
Notes Payable: Stockholders
48,500.00
First National Bank
75,995.00
Small Business Admin.
124,664.80
Total Liabilities
$325,280.50
STOCKHOLDERS' EQUITY
Capital Stock $1.00 Par
Authorized Shares $500,000.00
Issued Shares 251,946.00
$251.946.00
Paid In Surplus
51,599.00
$303,545.00
Less: Retained Earnings
3/31/68 (244,605.79)
Net Loss Period
End. 12/31/68 (55,703.48)
(300,309.27)
3,235.73
TOTAL LIABILITIES AND EQUITY
$328,516.23
3. The $50,000 difference between the allowed bankruptcy claim and the amount claimed as a theft loss by petitioner in this case is due to the inclusion of Mr. Conboy's $50,000 advance in petitioner's bankruptcy claim.↩
4. Respondent subpoenade Mr. Lacy for the trial in this case, but in the opinion of two doctors, it would have been injurious to Mr. Lacy's deteriorating health for him to have traveled to Mobile to testify.↩
5. Section 13-4-1, Code of Alabama 1975, provides as follows: Sec. 13-4-1. Selling mortgaged property without consent of mortgagor. Any person who sells or conveys any personal property, upon which he has given a written mortgage, lien or deed of trust, and which is then unsatisfied, in whole or in part, without first obtaining the consent of the lawful holder thereof to such sale or conveyance, shall, on conviction, be fined not more than $500.00 and may also be imprisoned in the county jail or sentenced to hard labor for the county for not more than six months, one or both, at the discretion of the jury. (Code 1876, sec. 4354; Code 1886, sec. 3836; Code 1896, sec. 4758; Code 1907, sec. 7423; Code 1923, sec. 5004; Code 1940, T. 14, sec. 362.)↩
6. Section 13-3-95, Code of Alabama 1975, provides as follows: Sec. 13-3-95. Money or goods on credit. Any person who, by false representation of his or any corporation's pecuniary condition, or under the false color and pretense of carrying on business, and dealing in the ordinary course of trade, obtains for himself or such corporation on credit from any person money, goods or chattels with the intent to defraud, or brings, or causes to be brought into this state any money, goods or chattels so obtained in any other state shall, on conviction, be punished as if he had stolen the same; and any person violating the provisions of this section may be indicted and tried in the county in which he resides or in any county into which he brings, or causes to be brought, any of such money, goods or chattels.↩
7. Compare Rev. Rul. 71-381, 1971-2 C.B. 126, holding a taxpayer is entitled to a theft loss deduction under sec. 165 (c) (3)↩ after having loaned maney to a corporation on the basis of fraudulent financial reports. The president of the corporation was convicted of violations of securities laws by issuing false and misleading financial documents.